# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**BRIAN EATON and CYNTHIA EATON, individually and on behalf of a class of all other similarly situated,**

**and**

**CUNNINGHAM PROPERTY MANAGEMENT TRUST, individually and on behalf of a class of all other similarly situated,**

      **Plaintiffs**

  **v.**

**ASCENT RESOURCES – UTICA, LLC**

      **Defendant.**

**Case No. 2:19-cv-3412**

**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## <u>OPINION AND ORDER</u>

Plaintiffs Brian Eaton, Cynthia Eaton, and Cunningham Property Management Trust (collectively "Plaintiffs") move for this Court to certifying their proposed class under Federal Rule of Civil Procedure 23(b)(3). (Pls. Mot. to Certify, ECF No. 37). Defendant Ascent Resources – Utica, LLC ("Ascent") responds in opposition, (ECF No. 41), and simultaneously moves to exclude the opinions of Plaintiffs' expert (Def. Daubert Mot., ECF No. 40). Both motions are now fully briefed and ripe for review. For the reasons stated below, the Court **DENIES** Defendant's *Daubert* motion, (ECF No. 40), and **GRANTS** Plaintiffs' motion for class certification. (ECF No. 37).

## I.      Alleged Facts

### A.  The Oil and Gas Leases

This case involves the alleged underpayment of royalties on oil and gas leases. Plaintiffs Cunningham Property Management Trust ("Cunningham"), and Brian and Cythia Eaton ("the Eatons"), are the lessors to oil and gas leases with Ascent, a natural gas and oil producer doing business in Ohio. (Lenocker Dep. at 17, ECF No. 37-3; *see* Cythia Dep., ECF No. 37-2, PageID 689; ECF No. 21-1; *see also* Philip Dep. at 11, 12, ECF No. 37-5; ECF Nos. 21-2, 21-3). Ascent became the lessee to Cunningham's and the Eatons' leases through assignment. (*See id.*) The Eatons allege that "as soon as Ascent took our checks over, they decreased about 50 percent." (Ex. 2, Cynthia Dep. at 14, 28, ECF No. 37-2, PageID 691, 705). Cunningham alleges a similar occurrence. (Philip Dep. at 18–19, ECF No. 37-5, PageID 821). The Eatons and Cunningham filed lawsuits against Ascent, which this Court has since consolidated. (Order, ECF No. 17).

While Cunningham and the Eatons both allege Ascent underpaid royalties, their allegations vary based on different provisions in their lease agreements. Specifically, the Eatons' lease contains a "Market Enhancement Clause" that provides:

> [A]ll oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transportation, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted . . . .

(Eaton Oil and Gas Lease, ECF No. 21-1, PageID 256) (emphasis added).

Cunningham's leases do not contain a market enhancement clause. Instead, the Cunningham lease requires Ascent to pay royalties based on a proportionate share of the wellhead price. (Cunningham Leases at ¶ 5, ECF Nos. 21-2, 21-3). In a prior Opinion and Order, this Court

applied the at-the-well rule and held that the Cunningham leases permit post-production deductions to the lessor's royalty payments, but only to the extent that the deductions are reasonable. *Cunningham Prop. Mgmt. Tr. v. Ascent Res. – Utica, LLC*, 351 F. Supp. 3d 1056, 1062, 1064 (S.D. Ohio 2018).

According to Ascent's revenue controller, Jeff Lenocker, Ascent places leases into three main categories (also known as MEG groups), "gross proceeds" leases, "net proceeds" leases (subclasses (a), (b), and (c)), and "market enhancement clause" leases (subclasses (d) and (e)).[1] (Lenocker Dep. at 72, ECF No. 37-3). Ascent treats all the lessors in a MEG group the same for royalty deductions. (*Id.* at 19–20, 70–73). The Cunningham leases both fall into the "net proceeds" MEG group, while the Eatons' lease falls into the "market enhancement clause" MEG group. Of Ascent's approximately 5,797 producing leases, it appears that around 3,000 are categorized as net proceeds leases, and 651 are categorized as market enhancement leases. (*See* Harper Report at 35, ECF No. 38-1).

### B. Rick Harper's Expert Report

Plaintiffs' proffered expert, Rick Harper, opines that Ascent is taking "substantially higher than anticipated" deductions from the net-proceeds lease royalties, and deducting from the market enhancement lease royalties without considering whether the deductions enhance value. (*Id.* at 5, 36). Harper has 40 years of experience in the energy industry. (*Id.* at 3). Among other positions, Harper has served as President of ARCO Gas, and President and CEO of CANOR Energy, Ltd. (*Id.*) Harper has also served as an advisor and consultant in varying capacities. (*Id.*)

Harper based his opinions on experience, the COPAS Gas Accounting Manual, and a comparison of Ascent to other producers. (*E.g.*, *id.* at 36). The COPAS Gas Accounting Manual

---

[1] Ascent states that there are also "Partial Net" leases. (Def. Resp. at 14, ECF No. 41, PageID 1053).

contains industry guidelines for oil and gas accounting, as well as the payment of royalties. (*Id.* at 17). Harper explained that COPAS guidelines state: "Where deductions are permitted, care should be taken to ensure that the amounts deducted are fair and commensurate with the services provided." (*Id.*) The guidelines continue, "[i]f costs developed in the normal manner appear to be unusually high, they should be referred to the proper person in the company for a decision about whether actual costs should be used or whether an estimated lower rate should be substituted for actual costs." (*Id.*) After reviewing Lenocker's deposition, Harper observed that Ascent does not follow COPAS guidelines, and instead deducts post-production costs without regard for the deduction amounts.

Harper compared Ascent to other producers based on royalty statements, Antero's (a competitor's) explanation of its royalty payment practices, and publicly available documents such as SEC filings. (*Id.* at 1–2, 19–22, 27–34). Reviewing Cunningham's royalty statements and concluding that the post-production deductions were "substantially higher than anticipated," Harper observed that in October 2018 over 50% of the value of the natural gas was deducted for post-production costs. (*Id.* at 5, 16). Harper further observed that when commodity prices were lower in February and March of 2016, the deductions reached 70% and 88% of the gas' value respectively.

In a similar manner, when analyzing the market enhancement leases Harper compared the Eatons' royalties with those that Antero and EQT paid to similarly situated lessors (Carpenter and Gaughan respectively). (*Id.* at 26–27, 33). Harper concluded that "Antero is paying the Carpenters almost double, per gallon, that Ascent paid the Eatons[.]" (*Id.* at 30) (emphasis removed). Similarly, "Ascent was deducting over twice as much as EQT." (*Id.* at 34). Reviewing the Eatons' royalty statements, Harper further reported that in April 2016, post-production costs exceeded the

value of the natural gas, and Antero "deducted that loss from its lessors[,]" resulting in "negative royalties." (*Id.* at 32) (emphasis removed).

In addition to opining on whether Ascent's deductions were higher, Harper also opined on the reason the deductions were higher: affiliated party transactions. (*Id.* at 5, 36). Through Adam Wilson (Ascent's Midstream and Marketing Director), Harper learned that Ascent's contract with Mark West was an affiliated party transaction. (*Id.* at 18). Harper reviewed Ascent's contract with Mark West. (*Id.* at 13). Wilson also confirmed that Energy Minerals Group (EMG) and First Reserve Corporation own at least 50% of Ascent, and that those companies also own or have substantial stakes in companies providing gathering, processing, and transportation services to Ascent. (*Id.*). Harper also reviewed Ascent's consolidated Financial Statements from 2016, 2017, and 2018, which revealed that Ascent had entered into contracts with eight different affiliated parties. (*Id.* at 18–19). Comparing Ascent's gathering, processing, and transportation expenses to those of Montage, EQT, and Antero, Harper determined that Ascent's competitors generally had lower expenses than Ascent. (*Id.* at 22).

Based on his review of the records and his experience, Harper concludes that Ascent pays inflated expenses to affiliated parties. (*Id.*) While Harper concludes that Ascent's payment of inflated prices to affiliated parties is the reason for the higher post-production deductions, Harper opines that Ascent's deduction amounts are high regardless based on his experience, COPAS guidelines, and a comparison with other producers. (*Id.* at 36). And, regarding the market enhancement leases, Harper concludes that Ascent did not consider whether the expenses it deducts had enhanced the value of the product, and that Ascent over-deducted. (*Id.*) Finally, Harper concludes that these practices are ongoing. (*Id.*)

## II.    *Daubert* **Motion – Standard**

Evidentiary rulings are subject to the district court's sound discretion, *Frye v. CSX Trans., Inc.*, 933 F.3d 591, 598 (6th Cir. 2019), including the admissibility of expert testimony. *United States v. Dunnican*, 961 F.3d 859, 875 (6th Cir. 2020). The Supreme Court has described a district court's obligation to determine the admissibility of expert testimony as one of "gatekeeping," ensuring that "any and all scientific testimony evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 597 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 143, 141 (1999) (holding that the district court serves a gatekeeping function for non-scientific expert testimony). This role, however, is not intended to supplant the adversary system or the role of the jury. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008). Arguments regarding the weight to be given to any testimony or opinions of an expert witness are properly left to the jury. *Id*. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The burden is on the party proffering the expert testimony to demonstrate by a preponderance of proof that the opinions of their experts are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."); *Jahn v. Equine Servs.*, *PSC*, 233 F.3d 382, 388 (6th Cir. 2000) ("The Court [in *Daubert*] explained that Rule 702 displays a liberal thrust with the general approach.").

### III. Analysis

Plaintiff argues that Rick Harper's opinions in his expert report are inadmissible. Expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In this circuit, "[t]he Rule 702 analysis proceeds in three" steps: (1) the expert witness must be qualified to give their opinion, (2) the opinion must be relevant, and (3) the opinion must be reliable. *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). Ascent does not raise arguments against Harper's qualifications or the relevance of his opinions, so this Court proceeds to the third step: reliability.

Ascent submits that Harper's opinions are unreliable because they "(1) do not rely upon established facts, but instead rely on unsupported assumptions that are factually inaccurate; (2) do not rely upon a reasonable, repeatable methodology, but often upon no methodology at all . . . or (3) offer legal opinions and conclusions." (Def. Mot. at 4, ECF No. 40, PageID 913). The Court addresses each argument in turn.

First, Ascent argues that Harper's opinion on related-party transactions is based on an "assumption." (Def. Mot., ECF No. 40, PageID 917). According to Ascent, Harper "assumed" that contracts are entered into with affiliates, and thereby concluded that the costs are uniformly excessive without reviewing each contract. (*Id.* at PageID 917–18).

As Plaintiffs established in their response, Harper's opinion is based on more than an assumption. Harper reviewed the testimony of Adam Wilson, who testified (1) that Ascent's contract with Mark West is a related-party transaction, and (2) that two companies owning a majority stake in Ascent also have substantial stakes in various companies providing gathering, processing, and transportation services to Ascent. (Harper's Report, ECF No. 38-1, PageID 879). In addition, Harper reviewed Ascent's 2016, 2017, and 2018 consolidated financial statements, which reported the affiliated entities with which Ascent contracts. (*Id.* at PageID 879–80).

Moreover, Ascent points to no authority for its proposition that Harper must review every contract before concluding that the costs are excessive. Though a contract-by-contract review may have been one way Harper could have established the basis of his opinion, this Court is not persuaded it was the only reliable way he could do so. At this juncture, the foundation upon which Harper's related-party opinion rests is sufficiently reliable.

Ascent next argues that several of Harper's opinions are not based on a reliable methodology. (Def. Mot., ECF No. 40, PageID 919, 920, 925, 927). Ascent's methodology-based arguments contain considerable overlap. For example, according to Ascent, Harper's opinions about the reasonableness and propriety of the deductions taken from the two lease types are unreliable because they are based on single data points ("one royalty statement" for "one well"). (*Id.* at PageID 921, 923, 927). Plaintiffs respond, among other ways, by submitting that Ascent has mischaracterized the nature of Harper's report. (Pls. Resp. at 5, ECF No. 49, PageID 1267).

Through Plaintiffs' response, and a review of Harper's report, the Court is satisfied that Harper's methods are sufficiently reliable for use in support of Plaintiffs' motion for class certification. Harper's expert testimony is experience based. It is well established that "the test of reliability is 'flexible,'" and that experience-based testimony can satisfy Rule 702 admissibility

requirements. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The meat of Harper's report is that Ascent is taking excessive deductions from the net processing leases, and that Ascent is not undertaking any market enhancement analysis for the market enhancement leases. As detailed above, Harper has extensive experience in the industry. (Harper's Report, ECF No. 38-1, PageID 864). In addition, in forming his opinions Harper reviewed a contract between Ascent and an affiliated party, several royalty statements, COPAS guidelines, and Lenocker's testimony; and he compared Ascent with three regional shale producers. The Court has reviewed Harper's report, and his opinions are not *ipse dixit* as Ascent suggests.

Last, Ascent argues that Harper offers "legal opinions," which this Court should exclude. (Def. Mot. at 18, ECF No. 40, PageID 927). Specifically, Ascent submits that "Harper's opinion that the COPAS Gas Accounting Manual dictates lesser charges and Ascent's purported failure to adhere to the COPAS manual results in higher costs to lessors should be excluded." (*Id.*) Plaintiffs respond that Harper is "opining on whether Ascent followed industry standards as exemplified in COPAS guidelines, but whether a failure to follow these guidelines under the circumstances present here constitutes a breach of contract or otherwise satisfies the elements of unjust enrichment or fraud is a legal conclusion left to the Court." (Pls. Resp. at 7, ECF No. 49, PageID 1269). Plaintiffs' response is well taken.

Upon reviewing Harper's report, this Court finds no instance when Harper stated that the COPAS Gas Accounting Manual "dictates" lesser charges. (Def. Mot. at 18, ECF No. 40, PageID 927). Indeed, Harper refers to COPAS as "guidelines." (*E.g.*, Harper Report at 36, ECF No. 38-1, PageID 897). Because Harper has not opined that COPAS guidelines dictate lesser charges, no such opinion exists to exclude. Harper's opinion that Ascent did not follow industry standards as exemplified in COPAS guidelines is not a legal opinion.

9

For these reasons, the Court **DENIES** Ascent's *Daubert* motion. (ECF No. 40).

### IV.     Motion for Class Certification - Standard

A district court has broad discretion to decide whether to certify a class. *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996). When determining whether to certify a class, the Court "must begin [its] analysis with a recognition that the 'class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."'" *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 ,388 (2011)).

> To obtain class certification, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four requirements—numerosity, commonality, typicality, and adequate representation—serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members. *Dukes,* 131 S.Ct. at 2550.

*Id*.

In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b). *Dukes,* 564 U.S. at 345; *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 537 (6th Cir. 2012). *In re Whirlpool Corp.*, 722 F.3d at 850–55. Federal Rule of Civil Procedure 23(b) authorizes three types of class action suits. *See* Fed. R. Civ. P. 23(b)(1), (2), (3).

Here, Plaintiffs request certification under Rule 23(b)(3). For Rule 23(b)(3) to authorize class certification, Plaintiffs must show that "the questions of law or fact common to class members predominate[,]" and that a class action is the "superior" method for "fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Implied in addition, Plaintiff's must show

10

that the class description is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Young*, 693 F.3d at 537–38 (the ascertainability requirement).

**B.      Consideration of the Merits at the Class Certification Stage**

An argument Plaintiffs make in their certification briefing is that Ascent conflates certification with a merits decision. In this regard, the Sixth Circuit explains:

> Class certification is appropriate if the court finds, after conducting a "rigorous analysis," that the requirements of Rule 23 have been met. *Dukes*, [564 U.S. at 351]; *Young*, 693 F.3d at 537; *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Ordinarily, this means that the class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079. On occasion "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. *Dukes*, [564 U.S. at 351]. There is nothing unusual about "touching aspects of the merits in order to resolve preliminary matters . . . [because doing so is] a familiar feature of litigation." *Id*. at 351–52. But permissible inquiry into the merits of the plaintiffs' claims at the class certification stage is limited:
>
>> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.
>
> *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) (citing *Dukes*, 131 S.Ct. at 2552 n.6 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974))).

*In re Whirlpool Corp.*, 722 F.3d at 851.

The *In re Whirlpool* court continued, stating that "[t]he Supreme Court's recent opinions in *Amgen* and *Dukes* now clarify that some inquiry into the merits may be necessary to decide if

the Rule 23 prerequisites are met." *Id.* (citing *Amgen*, 568 U.S. at 464; *Dukes*, 564 U.S. at 349–350).

> *Amgen*, however, admonishes district courts to consider at the class certification stage only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied. *See Amgen*, [568 U.S. at 460]. In other words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012).

*Id.* at 851–52.

The Court herein has considered only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied.

## V.     Analysis

### A. Ascertainability

As a threshold matter and an implied requirement of the Rule 23(b)(3), plaintiffs must show that their proposed class is ascertainable. *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 537–38 (6th Cir. 2012). To be ascertainable, "the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Id.* (quotation omitted). There are two important elements to meet when defining a class: "(1) specifying a particular group at a particular time frame and location who were harmed in a particular way; and (2) defining the class such that a court can ascertain its membership in some objective manner." *Edwards v. McCormick*, 196 F.R.D. 487, 491 (S.D. Ohio 2000) (citation omitted). Courts have "broad discretion to modify class definitions" to "ensure that a certified class is properly constituted." *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 619 (6th Cir. 2007).

Plaintiffs move to certify the following class:

All persons or entities (including their predecessors and successors-in-interest) who have received, or who are entitled to receive, royalty payments (whether as a

landowner or mineral owner) from natural gas or oil wells located within the State of Ohio and that have been owned or operated by Ascent (or any Ascent's affiliates, predecessors, successors, or subsidiaries), or whose royalties are paid by Ascent regardless of whether Ascent is the actual lessee since October 1, 2014, or for which Ascent (or any Ascent's affiliates, predecessors, successors, or subsidiaries) was the "lessee" or owner of the "working interest" pursuant to any oil and gas lease, or for which Ascent was associated with such wells or associated drilling units, since October 1, 2014.

**Subclass (a):** All persons or entities within the Class who have had deductions for "gathering" and "compression" expenses taken from royalty payments by Ascent.

**Subclass (b):** All persons or entities within the Class who have had deductions for "processing" expenses taken from royalty payments by Ascent.

**Subclass (c):** All persons or entities within the Class who have had deductions for "transportation" expenses taken from royalty payments by Ascent.

**Subclass (d):** All persons or entities within the Class for which Ascent has classified the lessor as having a "market enhancement clause" lease who have had deductions for "processing" expenses taken from royalty payments by Ascent.

**Subclass (e):** All persons or entities within the Class for which Ascent has classified the lessor as having a "market enhancement clause" lease who have had deductions for "transportation" expenses taken from royalty payments by Ascent.

(Mot. to Certify at 1, ECF No. 37). Plaintiffs include the following exclusions to their class

definition:

Excluded from the Class and each Subclass are Ascent, any of its affiliates, parents, subsidiaries, officers, directors, employees, legal representatives, successors, and assigns, and any entity in which Ascent has a controlling interest, as well as that entity's officers, directors, employees, legal representatives, successors, and assigns, in addition to the judicial officers and their immediate family members and court staff assigned to this lawsuit. Also excluded are those persons or entities whose royalties are paid per an overriding royalty interest, or those with working interests.

(*Id.* at 18).

Plaintiffs contend that this class definition specifies a particular group, a particular time

and location, and a particular harm. (Pls. Mot. to Certify, ECF No. 37, PageID 534). The group:

persons entitled to receive royalties from Ascent. The time: since October 1, 2014. The location:

natural gas or oil wells in Ohio. And the harm: deductions which Plaintiffs allege to be unlawful. The Court agrees that Plaintiffs have identified a sufficiently definite group, time, location, and manner of injury.

Plaintiffs submit that their definitions for the class and subclasses allow the Court to use "Ascent's own MEG group 'buckets,' lease records, and royalty records" to objectively ascertain membership. (*Id.* at PageID 535). Again, the Court agrees that the MEG groups do allow for an objective way to ascertain class membership. However, the precise language of the class definition is another matter.

Ascent contends that the class is not ascertainable based on numerous arguments that the Court has distilled into the following: (1) class members cannot be identified without extensive factual and individualized inquiries, and (2) the proposed class definition contains vague and ambiguous language that prevents the Court from objectively determining class membership. (*See* Def. Resp., ECF No. 41, PageID 1083–90).

Some of Ascent's arguments concerning the scope and clarity of Plaintiffs' proposed class definition are persuasive. For example, the language of the proposed class covers people receiving royalties from natural gas or oil wells "for which Ascent was associated with such wells or associated drilling units, since October 1, 2014." (Mot. to Certify at 1, ECF No. 37). The Court agrees with Ascent that this language is problematically vague. Ascent makes other similar arguments with varying degrees of persuasiveness, but none of which is fatal to the class. Rather than address each of these arguments individually, the Court will exercise its power to redefine the class. *See Powers*, 501 F.3d at 619. Having taken Ascent's arguments under advisement, the Court redefines the class as follows:

> All persons or entities (including their predecessors and successors-in-interest) who have received, or who are entitled to receive, royalty payments from natural gas or

oil wells located in Ohio, who were paid royalties by Ascent at any time since October 1, 2014, and who fit into one or more of the following subclasses.

**Subclass (a):** All persons or entities who have had deductions for "gathering" and "compression" expenses taken from royalty payments by Ascent.

**Subclass (b):** All persons or entities who have had deductions for "processing" expenses taken from royalty payments by Ascent.

**Subclass (c):** All persons or entities who have had deductions for "transportation" expenses taken from royalty payments by Ascent.

**Subclass (d):** All persons or entities for which Ascent has classified the lessor as having a "market enhancement clause" lease who have had deductions for "processing" expenses taken from royalty payments by Ascent.

**Subclass (e):** All persons or entities for which Ascent has classified the lessor as having a "market enhancement clause" lease who have had deductions for "transportation" expenses taken from royalty payments by Ascent.

**Exclusions:** Excluded from the Class and each Subclass are Ascent, any of its affiliates, parents, subsidiaries, officers, directors, employees, legal representatives, successors, and assigns, and any entity in which Ascent has a controlling interest, as well as that entity's officers, directors, employees, legal representatives, successors, and assigns, in addition to the judicial officers and their immediate family members and court staff assigned to this lawsuit. Also excluded are those persons or entities whose royalties are paid per an overriding royalty interest, or those with working interests.

The members of the modified class can be objectively identified in the manner proposed by Plaintiffs: using Ascent's MEG groups, lease records, and royalty records. According to Ascent, there is an ascertainability issue because using its records would require individualized inquiry. (Def. Resp., ECF No. 41, PageID 1084). However, courts have found and this Court agrees that "the need to review individual files to identify [class] members [is] not [a] reason[] to deny class certification." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539 (6th Cir. 2012) (citations omitted). Though a records review may be time consuming, that does not make the inquiry any less objective. The class, as modified, satisfies the ascertainability requirement for class certification under Federal Rule of Civil Procedure 23(b)(3).

## B. Rule 23(a)

For a class to receive class certification under Rule 23(b)(3), the class must first satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and representative adequacy.

### 1. Numerosity

First, Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no strict numerical test for determining impracticability." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (1996). Sufficient numerosity is instead determined case by case, based on the facts. *See id.* Though, the numbers are an important fact to consider. Indeed, where the class size is large enough "numbers alone" make joinder impractical, thus satisfying the numerosity requirement. *Id.*

This class satisfies the numerosity requirement. There are approximately 3,000 "net proceeds" leases that fall into subclasses (a) (b) and/or (c), and 651 "market enhancement" leases that fall into subclasses (d) and (e). (Harper Report at 25, 35, ECF No. 38-1). Ascent argues that Plaintiffs have not provided evidence as to the "number of people" in each subclass and thus do not satisfy the numerosity requirement. (Def. Resp. at 34, ECF No. 41, PageID 1073). However, while Ascent is technically correct that Plaintiffs referred to leases rather than people, the Court can infer that these numerous leases are held by numerous people. Indeed, elsewhere in its briefing Ascent refers to the "individual terms of the thousands of unnamed class members' leases . . . ." (*Id.* at 31, PageID 1070).

### 2. Commonality

Second, Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The claims of the class members must "depend upon a common contention" the truth or falsity of which will resolve a "central" issue "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011). Though Rule 23(a)(2) requires common questions, more accurately it requires "common *answers*." *Id.* (quotation omitted) (emphasis retained).

Plaintiffs contend that their claims involve common questions of law and fact. They identify several common questions of law or fact, including: (1) "whether Ascent is taking unreasonable deductions from its royalty payments as a result of the same policies and practices[,]" (2) whether Ascent is "deducting inflated expenses paid to affiliated companies outside of arm's length transactions[,]" and (3) whether Ascent is "failing to enhance prices obtained for gas sold under market enhancement leases so as to preclude Subclass (d) and (e) deductions[.]" (Pls. Mot. to Certify at 30, ECF No. 37, PageID 538; Pls. Reply at 4–5, ECF No. 48, PageID 1244–45).

According to Plaintiffs, Ascent has "consistently" applied "the same policies or practices" to all of the class members. (Pls. Mot. to Certify at 30). That is, Ascent "groups its leases into basic categories, the MEG groups, that are then subject to the same treatment for each and every lease that falls into that category or 'bucket,' regardless of differences in lease language that the categorization renders inconsequential for purposes of the bucket treatment." (*Id.*) And Ascent "employs the practice of dealing with affiliates across the board, affecting all class members." (*Id.*)

Ascent argues that Plaintiffs have not proven commonality because Plaintiffs did not submit the terms of the unnamed class members' leases and variations in the terms can destroy commonality. (Def. Resp. at 24–25, ECF No. 41, PageID 1063–64). The trouble with Ascent's argument is that by grouping these leases together and treating them the same, Ascent's conduct reveals that it views the variations in language as distinctions without a difference.

Ascent further argues that Plaintiffs "have not offered evidence" as to why failing to enhance prices under market enhancement leases creates a common question for subclasses (d) and (e). (Def. Resp. at 27, ECF No. 41, PageID 1066). However, Ascent's treatment of these leases

is uniform, and Lenocker admitted that Ascent gives no consideration to the amount of the deductions. (Lenocker Dep. at 145, ECF No. 37-3). Whether Ascent enhanced prices for people in the market enhancement MEG group will resolve whether Ascent adhered to the terms of these leases.

Plaintiffs have satisfied the commonality requirement. The members of subclass (a), (b), and (c) share common questions in whether Ascent's post-production deductions are unreasonable and whether affiliated party contracts are resulting in inflated prices. The members of subclass (d) and (e) share a common question in whether Ascent enhanced the prices obtained for gas sold under market enhancement leases. The answers to these questions will resolve central issues to this litigation in one stroke.

### 3. Typicality

Third, the representative parties' claims must be "typical" of the claims of the class. Fed. R. Civ. P. 23(a)(3). Courts use the typicality analysis to determine whether there is a "sufficient relationship" between "the injury to the named plaintiff and the conduct affecting the class[.]" *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quotation omitted). Plaintiffs claims are "typical" if they arise from "the same . . . practice or course of conduct that gives rise to the claims of other class members, and if [their] claims are based on the same legal theory." *Id.* (quotation omitted). The typicality requirement ensures that the interests of the representatives and the class are "aligned," for "in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* (citation omitted). "[A]s go[] the claim[s] of the named plaintiff[s], so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

The class representatives are typical of the class. Cunningham and the unnamed members of subclass (a), (b), and (c) share claims involving allegedly unreasonable deductions, and all of their leases fall into the same MEG group. So, the success or failure of Cunningham's claim should be typical of these subclasses. As goes Cunningham's claim, so go the claims of these subclass members. Similarly, the Eatons' claims are typical of subclass (d) and (e). Ascent placed all of the market enhancement leases into the same MEG and treated them the same. The Eatons' lease agreement with Ascent is one such market enhancement lease. The answer to whether Ascent abided by the terms of its agreement with the Eatons should be typical of subclass (d) and (e) because Ascent allegedly applied a common practice when calculating the royalties for these leases.

Ascent argues that Cunningham's leases are not typical of the class because they are subject to a unique defense: the law of the case. (Def. Resp. at 36, ECF No. 41). Ascent is referring to *Cunningham Prop. Mgmt. Tr. v. Ascent Res. – Utica, LLC*, wherein this Court held, *inter alia*, that the leases permitted Ascent to make reasonable post-production cost deductions to royalty payments. 351 F. Supp. 3d 1056, 1062, 1064 (S.D. Ohio 2018). Ascent's argument is perplexing, as it appears that Ascent is suggesting that it may not make post-production deductions to the royalties of the other leaseholders in Cunningham's MEG group. The Court assumes Ascent makes no such admission. However, Ascent's argument does highlight one of the values of class certification here—the avoidance of duplicitous litigation and the resulting strain on judicial resources.

Ascent similarly argues that the Eatons are subject to the "potential" unique defense that their lease contains a disclaimer of implied warranties. (Def. Resp. at 36, ECF No. 41). According to Ascent, that disclaimer makes for a unique defense because it is a distinguishing factor between

the Eatons' lease and Cunningham's two leases. (*See id.*) ("two of the three leases do not contain an express disclaimer, making it a unique defense."). However, Ascent does not explain how the disclaimer of implied warranties found in the Eatons' lease is any different than the disclaimers of implied warranties found in Cunningham's leases. (*Compare* ECF No. 21-1 at ⁋ 17 *with* ECF Nos. 21-2 and 22-3 at ⁋ 19). Ascent's argument is not well taken.

The Court finds that Plaintiffs claims arise out of the same practices or courses of conduct that give rise to the claims of the other class members, and their claims are based on the same legal theories. Plaintiffs have satisfied the typicality requirement.

### 4. Adequacy of Representation

Fourth, the Court must determine that the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives are adequate if they have "common interests with unnamed members of the class," and it appears the class representatives will "vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).

Plaintiffs offer Brian Eaton, Cynthia Eaton, and the Cunningham Property Management Trust as class representatives, as well as Ethan Vessels, Mark Troutman, and Shawn Judge as class counsels. Ascent does not raise any argument against the adequacy of class counsel, and upon reviewing their credentials and experience the Court approves of class counsel. Regarding the class representatives, all of them are members of the class, and through them all of the subclasses are represented. Brian and Cythia Eaton, and Philip Cunningham (as trustee to the Cunningham Property Management Trust ("the Trust")) averred that they are familiar with the litigation and willing to represent the interests of the class and subclass members. (*See* Brian Eaton Dep. at 18, ECF No. 37-1; Cynthia Eaton Dep. at 15, 19–20, ECF No. 37-2; Philip Cunningham Dep. at 21–

22, 26, ECF No. 37-5). David Cunningham is another trustee of the trust, and while he is less familiar with the case, in his capacity as a trustee he is willing to represent the interests of the class and subclass members. (David Cunningham Dep. at 22–23, 57, ECF No. 37-6; Philip Cunningham Dep. at 74, ECF No. 37-5).

Ascent raises several arguments that the class representatives would be inadequate, some of which are duplicative of arguments raised elsewhere. First, Ascent argues that the Eatons cannot serve as class representatives of subclass (a) because their royalties are not subject to the gathering costs. (Def. Resp. at 39, ECF No. 41, PageID 1078). The reader will recall that subclass (a) contains persons within the class that had gathering and compression expenses deducted from their royalties by Ascent. Even if the Eatons do not fall into subclass (a), they do fall into subclasses (d) and (e), and they still share common interests with the unnamed members of the broader class. Moreover, subclass (a) is still represented by Cunningham.

Mainly, Ascent attempts to distinguish the alleged injuries suffered by named plaintiffs and unnamed class members based on differences at the micro-level. (*See* Def. Resp. at 39, ECF No. 41, PageID 1078–80). However, when looking at the forest and not just the trees, the named plaintiffs share common interests with the unnamed class members, as was discussed in the sections on commonality and typicality. The Court sees no reason that the class representatives would do anything other than vigorously prosecute the claims of the class and their respective subclasses.

### C. Rule 23(b)(3)

As the Court has found that the requirements of Rule 23(a) are satisfied, the Court turns to the requirements of Rule 23(b)(3).

#### 1. Predominance

To be certified as a type 23(b)(3) class action, plaintiffs must show that the common questions of law or fact "predominate" over questions "affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests class cohesiveness. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997). Plaintiffs must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (quotation omitted). "'[T]he fact that a defense "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones."'" *Id.* (quotations omitted). Notably, "'common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.'" *Id.* (quotation omitted).

Plaintiffs submit that the common questions of law and fact predominate because the answers to those questions are central to their claims. Plaintiffs further posit that individualized damages will not predominate over the common questions, but that if needed the Court could address individualized damages through decertification later. (Pls. Mot. to Certify at 41, ECF No. 37, PageID 549). The Court agrees.

Plaintiffs' claims include breach of contract, unjust enrichment, and fraud, as well as a claim to an equitable accounting. For subclasses (a), (b), and (c), Plaintiffs' claims are premised on their allegation that Ascent takes unreasonable deductions from their royalty payments. One of

Plaintiffs' theories is that Ascent pays inflated prices to affiliated parties, resulting in unreasonably high deductions. The common questions for subclasses (a), (b), and (c) concern whether Ascent's transactions with affiliates result in inflated deductions and whether these deductions were unreasonable. For subclasses (d) and (e), Plaintiffs allege that Ascent is failing to adhere to the terms of their market enhancement clauses. Plaintiffs theorize that when Ascent calculates royalties under these leases, Ascent's common practice is to apply deductions without regard for whether the costs resulted in a price enhancement. The common question for subclasses (d) and (e) is whether Ascent is failing to enhance prices obtained for gas sold under market enhancement leases. These common questions are central to Plaintiffs' claims.

Moreover, Plaintiffs submitted Lenocker's deposition and Harper's expert report as generalized evidence that can support their claims. Lenocker's deposition is generalized evidence of Ascent's practices when making royalty deductions. Harper's expert opinion is generalized evidence of the reasonableness of the deductions. Harper also analyzed Ascent's general practices when paying royalties under market enhancement leases, which amounts to further general evidence.

Ascent contends that individual issues predominate over common questions. Broadly, Ascent argues that individual issues predominate because deductions vary by contract and damages cannot be calculated on a class-wide basis. (Def. Resp. at 29, 33, ECF No. 41, PageID 1068, 1072). Additionally, Ascent contends that 330 of the approximately 670 leases in subclass (d) and (e) contain arbitration provisions, which adds to the predomination of individual issues. (*See id.* at 33; Def. Ex. D at ⁋ 21, ECF No. 41-4).

The individual issues raised by Ascent do not predominate over the common questions. The issue of individualized damages amounts does not risk predomination because this Court may

bifurcate the issues of liability and damages if that proves to be the appropriate course. *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004) (citing Fed. R. Civ. P. 23(c)(4)(A)). To the extent that deductions vary based on who Ascent is contracting with for services such as compression and processing, this Court is not convinced that Ascent's service contracts will bog down these proceedings in a quagmire of individual issues.

The issue of arbitration provisions in the leases of some unnamed class members is also manageable without risk of predomination. Courts have found, and this Court agrees, that "though some putative class members may be subject to a mandatory arbitration clause, this individual issue does not predominate over the common issues." *Slamon v. Carrizo (Marcellus) LLC*, 2020 U.S. Dist. LEXIS 87149 at *64 (M.D. Penn, May 18, 2020) (citations omitted). As the *Slamon* court observed, issues related to arbitration provisions can be resolved later, if appropriate, through the creation of subclasses or the elimination of certain members of the class. *Id.* at *65.

Rule 23(b)(3) requires the common questions to predominate, but Rule 23(b)(3) does not require the common questions to be the only questions. While it appears that this case, as any case, involves some individual issues, Plaintiffs have shown that the common questions are central and predominating.

## 2. Superiority

In addition to showing predomination, plaintiffs must also show that a class action is the "superior" method for adjudicating the controversy fairly and efficiently. Fed. R. Civ. P. 23(b)(3). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citation omitted). Indeed the Advisory Committee designed Rule 23(b)(3) to "cover cases 'in which a class action would

achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (citation omitted).

Typically, a class action is a better vehicle for litigation when there is a single course of wrongful conduct, while it is less suitable for use when many individual inquiries are necessary. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012) (citations omitted). When gauging whether a class action is the superior vehicle for litigation, matters to consider include

> "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

Fed. R. Civ. P. 23(b)(3)(A)–(C).

Plaintiffs submit that a class action is the superior method of adjudicating this case because it is the most economically feasible option for the parties and puts the least strain on judicial resources. (Pls. Mot. to Certify at 42–43, ECF No. 37, PageID 550–51). Ascent responds by labeling Plaintiffs' assertion as conclusory and returning to its "individual issues" argument. (Def. Resp. at 42–43, ECF No. 41, PageID 1081–82).

Adjudicating this matter through a class action will resolve issues common to several thousand leases at once. In so doing, it will avoid a scenario where the same issues are subject to virtually duplicitous litigation by individual plaintiffs. The benefit of avoiding this scenario is twofold. First, it will cut down on costs for the litigants and the judiciary. Second, it will avoid the possibility of inconsistent results.

Moreover, the Court does not find Plaintiffs' assertions to be conclusory. The possibility that some class members would not litigate their claims individually due to economic infeasibility is readily apparent. And, because a class action allows for the litigation of these class members' claims, that is another reason to conclude that a class action is a superior method of litigation.

Last, this Court notes that the extent of the litigation of this case is already well along. As previously discussed, the Court has already held that the Cunningham leases permit reasonable post-production deductions, and has dismissed Cunningham's claim that the leases did not permit any such deductions. *Cunningham Prop. Mgmt. Tr. v. Ascent Res. – Utica, LLC*, 351 F. Supp. 3d 1056, 1062, 1064 (S.D. Ohio 2018). A class action moves the individual class members past this issue.

In short, the Court agrees that a class action is the superior method of adjudicating this case.

## VI.    Conclusion

For the reasons stated above, the Court **DENIES** Defendant's Daubert motion, (ECF No. 40), and **GRANTS** Plaintiffs' motion for class certification. (ECF No. 37). The Court's grant of class certification under Fed. R. Civ. P. 23(b)(3) is subject to the class definition modifications included herein.

**IT IS SO ORDERED.**


<u>8/4/2021</u>                                   <u>  s/Edmund A. Sargus, Jr.</u>
**DATE**                                       **EDMUND A. SARGUS, JR.**
                                               **UNITED STATES DISTRICT JUDGE**